FILED DEC 3 '18 PM 2 27USBC-GBO

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO

In re:                                  )            Chapter 13
    RALPH M. FOSTER,

                                   Case No . 18-80466

                    Debtor,        )

---

## DEBTOR'S RULE 59 AND 60 MOTION FOR RECONSIDERATION AND/OR TO VACATE/AMEND  ORDER  DISMISSING CASE FOR CAUSE AND
## MOTION FOR STAY OF PROCEEDINGS PENDING APPEAL IN CASE OF DENIAL

Debtor moves the Court under Rules 59 and 60 of Fed. R. Civ. P., to reconsider and/or vacate/amend its order dismissing this case for cause and shows as follows:

### SUMMARY OF ISSUES RAISED

This Court found that "cause" existed for dismissal of the case due to "bad faith" on the part of Debtor in submitting his chapter 13 plan presumably because he knew that his plan was unfeasible and/or not confirmable. This Court's grounds for dismissal however is simply not supported by the record and in fact in many instances, is contrary to the record in that (1) the record shows that Debtor's proposed chapter 13 plan payments and terms were identical to those which the Trustee himself had proposed; (2) not only had Debtor made his plan payments as proposed in prior and current proposed plans, but he had actually substantially

1

*overpaid* his creditors based upon the Trustee's assessment and proposed payments not to mention in addition that Debtor had proposed plans to pay (and did pay) a tax debt that the Trustee proposed *not be paid*; (3) Debtor's over-payment to creditors and payment to creditors whose claim the Trustee proposed not be allowed or reduced (e.g. the state tax claim), meant that other creditors were not being treated fairly, violating a fundamental requirement that all creditors be treated fairly and thus required a redistribution of such over-payments to comport with bankruptcy law (all of which Debtor's plan proposed to do), (4) Wells Fargo's claim had been objected to by means of an adversary complaint and proceeding wherein Debtor alleged *inter alia*, that the mortgage loan had been modified and the undisputed record before this Court (in the form of a court hearing transcript and the very proof of claim submitted by Wells Fargo) established these allegations as true; (5) this Court's reliance on Debtor's statement at the hearing to the effect that Debtor admitted that he has not made a mortgage payment, is (without context) meaningless unless the Court also determined-- (a) that Wells Fargo would have accepted the payments (as Wells Fargo had never mentioned or conceded the existence of a modification in its proof of claim) (b)--whether the amount of the payments missed came anywhere near the total claimed by Wells Fargo (which is the only way the Court could possibly determine whether Debtor's plan treatment of Wells Fargo was in bad faith) and (c) whether in fact Wells Fargo had a claim at all

2

in the first instance since Debtor raised issues of Wells Fargo's standing to file such claim; (6) finally, to the extent the Court has found that Debtor's disposable income was only $3606, thus evidencing bad faith, the finding was simply due to clerical errors in transposing numbers so as to include Debtor's Spouse's income—*although the total income correctly appeared elsewhere in the documents*. When including spousal income, the total income for Schedule I is actually $10,075. Debtor's paperwork also failed to include an item entry in Debtor's spousal income on form 122C-1 (although the total combined income was correct). Amendments to these documents have been filed herewith. Debtor will discuss each of the foregoing points.

## LEGAL STANDARD

"A motion to reconsider is appropriate when the court has obviously misapprehended a party's position or the facts or applicable law, or when the party produces new evidence that could not have been obtained through the exercise of due diligence." *Madison River Mgmt. Co. v. Business Mgmt. Software Corp.*, 402 F. Supp. 2d 617, 619 (M.D.N.C. 2005).

## DISCUSSION

### The Record Shows that Debtor's Proposed Chapter 13 Plan Payments and Terms Were Identical to Those Which the Trustee Himself had Proposed.

Simply put, unless this Court could have found the Trustee's proposed plan

payments and dividends to creditors (as the Trustee had set out in his own Motion to Dismiss ) were not feasible or were in bad faith, then it could not possibly have found Debtor's proposed plan payments to have been in bad faith because Debtor's proposed plan payments and dividends were identical to those of the Trustee (with the exception of his blind acceptance to every fact contained in Wells Fargo's Proof of Claim which will be discussed *infra*).

In his Motion to Dismiss, the Trustee asserts the following payments which he believed to be indicative of required plan payments which is taken directly from p. 3 of his Motion:

| | | |
|---|---|---|
| b. | Payment on arrearage claim: | $3,462.20 per month |
| c. | SECU mortgage: | $727.00 per month |
| d. | IRS secured claim (with 4% interest per annum): | $741.00 per month |
| e. | IRS priority claim: | $21.23 per month |
| f. | NCDR priority claim: | $19.52 month |
| g. | CarMax: | $333.55 per month |
| h. | Ally: | $261.00 per month |
| i. | Flagship: | $232.00 per month |
| SUBTOTAL: | | $8,387.82 per month |
| Trustee percentage (8%): | | $671.03 per month |
| **TOTAL PAYMENT REQUIRED:** | | **$9,059.00 per month** |

As can be seen from Debtor's Amended Plan which was then before the Court and attached to the Motion for Clarification he proposed the exact same payment amounts to each such creditor including the exact same interest rates (again with the

4

exception of Wells Fargo which will be discussed in the next section). The 8% Trustee fee was also adopted therein.

But under Debtor's prior plan (based upon the Trustee's assessment) nearly every creditor had been overpaid and as to one creditor (the NC Department of Revenue's unsecured claim which the Trustee does not treat at all) Debtor had grossly overpaid. Thus there is an important and critical issue that neither the Court or the Trustee has heretofore acknowledged or addressed—*what should be done when certain creditors have received far more in payments from the Debtor than they should have received?*

## **Bankruptcy Law Requirement That All Creditors Receive Equal Treatment**.

("Trustees"), including debtors in possession ("DIP's") in Chapter 11, are endowed with the power to avoid certain transfers and transactions. These all further the fundamental bankruptcy policy favoring equal treatment of similarly situated creditors. The Bankruptcy Code provides an arsenal of avoiding powers to the Trustee or DIP. These include avoidance of "preferences," "fraudulent transfers," and **"unauthorized postpetition transfers**,". Why? Because equally placed creditors are to be treated equally and, if a creditor receives a beneficial position within a certain period before bankruptcy, this policy of equal treatment is violated. Moreover, under section 547(b) discussing preferences, an avoidable preference is a transfer of property of the debtor, to or for the benefit of a creditor, on account of

5

antecedent debt, made while the debtor was insolvent. Further,  where the trustee does not act, the debtor may exercise the trustee's powers. *Freeman v. Eli Lilly Fed. Credit Union (In re Freeman)*, 72 B.R. 850 (Bankr. E.D. Va. 1987).

In this case, oddly, the Trustee was aware that under Debtor's prior plan, he had been making payments directly to his creditors including the pre-petition unsecured debt to the NC Department of Revenue. It appears from the records of Debtor's prior bankruptcy that the Trustee had objected to Debtor making payments directly to his creditors noting that in this district (unlike other districts) the debtor must make his payments to the Trustee. This meant that Debtor's payments which were made directly to creditors were in violation of the rules of this district and deprived creditors of what would have been their rightful share of such payments. Despite having such knowledge, the Trustee refused to act to recover those direct payments. Debtor's amended Plan purported to do just that by redistributing the amounts in over-payment to creditors in a manner consistent with the Trustee's assessment of the creditors' respective claims and proposed payments on such claims.  This effort on the part of Debtor was viewed as a "bad faith" Plan simply because it proposed a reduction in payments to creditors only in such amount as would be commensurate with over-payments to that creditor under the the prior Plan. In its order of dismissal, the Court made mention only to the fact that Debtor's Amended Plan proposed a lower monthly payment **but said nothing about Debtor's reasons for**

6

**having done so.**[1] Consequently, Debtor can only surmise that the Court ignored, misapprehended or just plain forgot about Debtor's reasons for the lower payment and will now restate those reasons appearing of record and will note that this Court bears some responsibility for giving Debtor confusing, contradictory and unwritten instructions to the extent that it blames Debtor for doing what it believed the Court was asking be done.

### The Court Gave Debtor Confusing and Contradictory Instructions Regarding His Plan and Cannot Blame Debtor When Debtor Sought Clarification and None was Given.

Debtor filed his Motion for Clarification regarding certain comments and instructions the Court made at the hearing held on October 18, 2018 where the Court appeared to require Debtor to make "retroactive" payments of $4309 as had been proposed under the prior plan. Because the Court, by mentioning "retroactive payments" seemed to be of opinion that Debtor never made any prior payments under the prior plan (specifically August, September and October) or had not made payments in the amounts contemplated in the Amended Plan, Debtor sought to

---

1  This Court stated no more than the following at paragraph 21:

> Rather than paying his proposed plan payment of $4,309.67 and bringing his Third Plan current, on October 26, 2018 the Debtor filed a motion for reconsideration, clarification, and an extension of time to which he attached a "revised second amended plan" ("Fourth Plan"). Under his Fourth Plan, the Debtor decreases plan payments, proposing to pay $914.70 in October to bring his plan up to date retroactively, $3,487.23 in November and December, $3,827.28 in January, and then finally payments of $4,350.78 for the remainder of the plan.

inform the Court in his Motion for Clarification, that he was already current and sought to understand further whether he would be allowed credit for his over payments to creditors in light of the reduced payment amounts suggested by the Trustee.[2] Debtor fully explained in detail the amount of over-payments and how he had planned to account for the over-payments in a New Plan he had attached to the Motion for Clarification attaching thereto his receipts as proof of payment. Debtor was simply attempting to avoid making double payments to creditors who had already been overpaid as it was and was acting reasonably and in good faith.

The Court's order denying the Motion for Clarification refused to clarify how Debtor should proceed in light of the fact that he had already paid the creditors current and also said nothing as to how or if Debtor should account for the over-payments to all creditors even though Debtor had proposed to the Court how he would do so in the Motion. This Court would go no further than the following:

> Also, it appears the Debtor now wishes to change the terms of his proposed plan to those set forth in a Revised Second Amended Plan" filed as EXHBIT A to his motion and make payments accordingly. No permission from the court is needed for the Debtor to propose an amended plan prior to confirmation.

---

[2] Debtor stated in his Motion for Clarification:

> However, the Court appears not to have accounted for the fact that Debtor has already paid his creditors for these months in the amounts as had been provided for in the prior plan. Indeed in most cases (with the exception of the Internal Revenue Service) those creditors were paid in an amount greater than what is now proposed in the new plan as the new plan spreads payments to the creditors over a 60-month period.

(*See*, Doc. 72 at p. 2, ¶ 7).

But Debtor was not asking for "permission" but *direction* regarding treatment of over-payments. Debtor took great pains to demonstrate clearly how and to what extent each creditor had been overpaid:

> " Ally will have been **overpaid** in the amount of $243 for the 3-month period (the equivalent of 3 payments under the new plan); Flagship **overpaid** by $309 (the equivalent of 3 payments under the new plan); Carmax **overpaid** by $754.45 the equivalent of 2.26 payments under the new plan); and the N.C. Department of Revenue **overpaid** by $564 ( **the equivalent of just over 9 payments under the new plan**). "

see Motion at p. 4.

Yet for all this, the Court said nothing of the above reasons advanced by Debtor for the reduced payments beyond stating at ¶ 27:

> "Here, the Debtor's Fourth Plan is actually less feasible than his Third Plan *as it reduces the total amount he will pay into the plan.*:"

Debtor is at a loss to understand why the Court persistently refused to acknowledge the plain mathematical facts painfully set out in great detail in Debtor's Motion justifying the reduction but instead the Court unfairly left the impression that there was something untoward about Debtor's intentions in this reduction amounting to "bad faith".

The Court would continue to assert comments that went to development the unfair impression that Debtor was acting in bad faith stating again and again as follows:

> *Rather than paying his proposed plan payment of $4,309.67 and bringing his Third Plan current, on October 26, 2018 the Debtor filed a motion for reconsideration, clarification, and an extension of time to which he attached a "revised second amended plan" ("Fourth Plan").* **Under his Fourth Plan, the Debtor decreases plan payments, proposing to pay $914.70 in October to bring his plan up to date retroactively, $3,487.23 in November and December, $3,827.28 in January, and then finally payments of $4,350.78 for the remainder of the plan.**

(Order, Doc. 79, p. 4, ¶ 21).

It is not clear (or the Court does not suggest) that Debtor has not brought the Revised Plan current nor does the Court (or the Trustee) suggest that Debtor has improperly accounted for the over-payments to creditors under his Revised Plan. Debtor detailed the reason for the reduction in payments in his motion **based upon the Trustee's own payment calculations** as follows:

### PRIOR PLAN PAYMENTS MADE FOR AUGUST 2018 VS. NEW PLAN

| CREDITOR | PRIOR PLAN | NEW PLAN | OVER / UNDER +/- |
|---|---|---|---|
| ALLY FINANCIAL | $339.00 | $261.00 | $78.00 |
| FLAGSHIP ACCEPTANCE | $335.00 | $232.00 | $103.00 |
| CARMAX FINANCIAL | $585.00 | $333.55 | $251.45 |
| INTERNAL REVENUE SERV. | $458.00 | $692.00 | $234.00 |
| NC DEPT OF REV | $250.00 | $62.00 | $188.00 |
| STATE EMPLOY. CREDIT UNION | $724.00 | $724.00 | 0 |
| WELLS FARGO BANK | $1,721.00 | $1,721.00 | 0 |

**PRIOR PLAN PAYMENTS MADE FOR SEPTEMBER 2018 VS. NEW PLAN**

| CREDITOR | PRIOR PLAN | NEW PLAN | OVER / UNDER +/- |
|---|---|---|---|
| ALLY FINANCIAL | $339.00 | $261.00 | $78.00 |
| FLAGSHIP ACCEPTANCE | $335.00 | $232.00 | $103.00 |
| CARMAX FINANCIAL | $585.00 | $333.55 | $251.45 |
| INTERNAL REVENUE SERV. | $458.00 | $692.00 | $234.00 |
| NC DEPT OF REV | $250.00 | $62.00 | $188.00 |
| STATE EMPLOY. CREDIT UNION | $724.00 | $724.00 | 0 |
| WELLS FARGO BANK | $1,721.00 | $1,721.00 | 0 |

**PRIOR PLAN PAYMENTS MADE FOR OCTOBER 2018 VS. NEW PLAN**

| CREDITOR | PRIOR PLAN | NEW PLAN | OVER / UNDER +/- |
|---|---|---|---|
| ALLY FINANCIAL | $339.00 | $261.00 | $78.00 |
| FLAGSHIP ACCEPTANCE | $335.00 | $232.00 | $103.00 |
| CARMAX FINANCIAL | $585.00 | $333.55 | $251.45 |
| INTERNAL REVENUE SERV. | $458.00 | $692.00 | $234.00 |
| NC DEPT OF REV | $250.00 | $62.00 | $188.00 |
| STATE EMPLOY. CREDIT UNION | $724.00 | $724.00 | 0 |
| WELLS FARGO BANK | $1,721.00 | $1,721.00 | 0 |

From the above tables, the following specific schedule of payments and amount

of same, to be paid to the Trustee, is as follows:

- Staring immediately debtor will pay to the Trustee prior to November 1, 2018 the amount of $702 to bring the current plan up-to-date retroactively.

- Starting November 2018, Plaintiff will pay to the Trustee **$3450.70** ( for distribution to Wells Fargo ($1721), Credit Union ($724) and the IRS ($692) = $3137 plus a 10% Trustee fee bringing the total payment to $3450.70

- For December 2018, the same payment for the same creditors  and Trustee fees will be paid **($3450.70).**

- For January 2019, debtor will pay to Trustee **$3817.61** for the following creditors-- Wells Fargo ($1721), Credit Union ($724), the IRS ($692) and Carmax ($333.55) for a total of  $3470.55 plus a 10% Trustee fee  bringing the total payment to $3817.61

- For February 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee bringing the total payment to $4359.91.

- For March 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee bringing the total payment to $4359.91.

- For April February 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee  bringing the total payment to $4359.91.

- For May 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee  bringing the total payment to $4359.91.

- For June 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee  bringing the total payment to $4359.91.

- For July 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee  bringing the total payment to $4359.91.

12

- For August 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee  bringing the total payment to $4359.91.

- For September 2019, Debtor will pay to the Trustee **$4359.91** for the following creditors--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) = $3963.55 plus a 10% Trustee fee  bringing the total payment to $4359.91.

-  For October 2019  through the last month of the Plan, Debtor will pay **$4428.11,**  for all creditors as follows:--Wells Fargo ($1721), Credit Union ($724), the IRS ($692), Carmax ($333.55), Flagship ($232 ) and Ally ($261) and the N.C. Dept. of Revenue ($62) = $4025.55 plus a 10% Trustee fee bringing the total payment to $4428.11.

## **Wells Fargo's Claim Improperly Taken as True Over Debtor's Objections and Without a Hearing**.

The Court and the Trustee appeared to make a case for dismissal in a way which effectively denied Debtor a hearing on Wells Fargo's claim. No other claim or treatment of any other creditor was seriously in dispute because debtor was not in arrears with any other creditor. First, the Trustee flatly accepted wholly and without qualification, the validity of Wells Fargo's Proof of Claim to the last penny including in his Motion to Dismiss that Debtor be required to make a monthly arrears payment to Wells Fargo in the amount of $3642.20. Using this blindly accepted number based upon Wells' Proof a Claim, the Trustee arrived at a monthly plan payment of $9059 and the Court agreed in its dismissal order at ¶ 22 stating-- "*Per the Trustee's calculations, set forth in detail in his motion, plan payments of*

13

*$9,059.00 per month are required to address claims filed in the case*." This the Trustee had done (along with the Court) despite the fact that Debtor had raised his objections to Wells Fargo's Proof of Claim by way of his adversary complaint and despite the fact that a hearing on that objection had not been had or even scheduled. There is no question that this Court's actions deprived Debtor of a substantial right to be heard on his objection as this Court went on to comment at ¶ 23--

> "Wells Fargo supports the Trustee's Motion, asserting that the plan is not feasible and the proposed plan payments are insufficient to pay Wells Fargo's claim and other claims in the case."

Of what use and benefit is the claims objection procedure if this Court is allowed to arbitrarily avoid and deny such procedure and a hearing to debtors? This Court further erroneously suggested that:

> As the court held in the Debtor's previous case, the Debtor's plan is not feasible **if it is entirely contingent upon obtaining a favorable ruling in his adversary proceeding**. *In re Foster,* No. 16-80601 (Bankr. M.D.N.C. May 15, 2016). Thus, the Debtor's proposed plan payments are insufficient, and the Debtor simply does not have sufficient income to fund a feasible plan while retaining his residence. Debtor's failure to propose a feasible plan constitutes cause to dismiss under § 1307(c).

(order at ¶ 25).

The Court is in error for two reasons, (1) in this case, Debtor has asserted and included his objection to Wells Fargo's Proof of Claim in his adversary complaint *as he is permitted to do under Rule 3007(B),* and thus (2) Debtor's objection is not

**"<u>entirely</u> <u>contingent</u> upon obtaining a favorable ruling in his adversary**

14

**proceeding"** but is contingent also upon his objections (going to the existence, validity, payment amount, interest rate, amount of arrears and such other alleged issues—all of which deserved a hearing.

## WELLS FARGO'S PROOF OF CLAIM AND PLAN TREATMENT

### This Court Did Not Need to Determine the Adversary Proceeding to Deny Dismissal or Deny Wells Fargo's Proof of Claim Because Overwhelming Undisputed Facts Already Existed in the Record to Support Denying Dismissal and Show Wells' Proof Claim as False.

Debtor brought before the attention of this Court a transcript of the 2012 foreclosure hearing before the Clerk of Durham County Superior Court which has been used and relied upon by both Debtor and Wells Fargo particularly in the last bankruptcy case. A copy of that transcript is attached hereto as **EXHIBIT A**. During the course of that hearing Wells Fargo clearly testified that Debtor's loan had first been modified via a "Resolution Plan" and that Debtor purportedly thereafter defaulted under the modification and was then granted forbearance and defaulting thereunder as well[3]. The transcript (Exhibit A at transcript p. 9) reveals as follows:

---

[3]   Debtor never admitted defaulting at the foreclosure hearing as the transcript reflects and further testified that Wells Fargo simply decided to foreclose. Thus, to the extent that Debtor admitted in the hearing before this Court that he hadn't made a mortgage payment since the finding by the Clerk that Wells Fargo failed to prove it held the Note and dismissed the foreclosure, and to the extent that Wells Fargo waited 4 years before reasserting its status as the note holder and declaring default again, and to the extent Wells Fargo has denied the existence of a modified loan in its Proof of Claim let alone that it would have accepted the modified payment, the statement by Debtor is true that no payment has been made since 2012. But it is more accurate to say that Wells Fargo refused to accept the modified payment amount starting in 2012 and has never indicated to this Court seeking stay relief that the modified payment would have been accepted.

[The Fosters] **were approved and placed into a resolution—I'm sorry, a resolution plan that subsequently defaulted. There was proof of forbearance, but failed to timely make the payments under the terms of the agreement.**

Wells Fargo's Proof of Claim conveniently makes no mention of the fact that it had modified Debtors mortgage loan and would be judicially estopped from denying it had done so here based upon its prior testimony in state court. Wells Fargo deliberately concealed this fact from the Court. But additionally, a closer look at the payment records attached to Wells Fargo's Proof of Claim demonstrates not only that the loan was modified but contains evidence that the amount of the monthly payments were modified. For the last eight (8) months of the payments leading up to the failed 2012 foreclosure attempt, Wells' records show that Debtor's last 8 monthly payments between 2011 and 2012 (see Funds Received Column "C" and Unapplied Funds Column "L" at pp. 6-7, of Claim 7-1, Part 2, Attachment 1) were in the amount of $1075.91 per month.[4] Wells Fargo does not and cannot deny that it accepted those payments. Debtor's proposed plan payment to Wells Fargo in the amount of $1721 per month can now no longer be dismissed as merely some bad faith ploy on his part but instead proves to be profoundly accurate when the truth concerning the modification is considered. As it stands, Debtor has proposed a

---

4

    Debtor is not here conceding that this number establishes the amount of the monthly installment and has not changed his belief that the actual document, the Resolution Plan" will reflect a payment of $900 per month.

monthly installment of $900 (differing from Wells' reported $1075 by only $175). Debtor's total plan treatment of Wells Fargo was $1721 leaving, (after subtracting the $900 regular monthly installment) $821 toward arrears. Debtor maintains that when the "Resolution Plan", which Wells admits exist, **is actually produced by Wells Fargo**, it will show a $900 monthly payment (or possibly less) and not $1075. There is thus no question, even if Debtor had missed 55 or so payments (as the Court has mused in its Order), the total arrears according to Debtor's stated $900 installment would be in the approximate range of $50,000 which equates to a $825 per month payment on the arrears over a 5 year/60 month plan **(which is only a $4 per month difference from the $821 arrears payment proposed in the Plan)**. Is there "bad faith" in these facts and figures? The only bad faith on display here is that of Wells Fargo in deceiving this Court as to the whole truth concerning its transactions with Debtor and its concealing of documents.  But there are other problems with Wells Fargo's Proof of Claim.  Wells Fargo charged to Plaintiff's account a number of bogus fees and charges and also charged to Debtor's account the costs for its failed foreclosure attempt in 2012 to the amount of approximately $4000 dollars. This a matter this Court may judicially notice. It is not Debtor's obligation to finance Wells Fargo's failed and ill-advised legal escapades. There are also payments that Debtor alleged in his Adversary Complaint, were not credited. Given these facts and figures, Debtor's Plan treatment of Wells Fargo was not only

in good faith but was substantially demonstrated as plausible even on the present state of the record and even without discovery, litigation and a hearing that this Court has so far seen fit to deny Debtor. What absolutely can no longer be sustained in any case is the fiction that Debtor's monthly mortgage payment was $2509 per month. Wells Fargo is quite aware that it had deceived this Court with a false claim and is hoping that this Court's dismissal will forever hide and prevent such deception from ever surfacing. This Court should avoid even the appearance of taking part in such deceptive acts, vacate the dismissal and disallow Wells Fargo's Proof of Claim as a sanction.

## **CONSEQUENCES FOR FILING A FALSE PROOF OF CLAIM**.

Executing a proof of claim is a significant responsibility that carries with it severe consequences in the event that the claim is incorrect. Form B10 is rather straightforward about the penalties for filing a fraudulent claim: a fine of up to $500,000.00 or imprisonment for up to five years, or both. See *In re Shank*, 315 B.R. 799, 814 (Bankr. N.D. Ga. 2004)(Claimants filing false or "overstated claims in the expectation that their claims will not be scrutinized . . . do so at their own peril."). Under Rule 3001, there are also consequences for filing a "bad" claim. Sloppiness is not a crime but now carries a stiff penalty. Further, Form B10 includes a declaration which, according to the Committee Notes, "is intended to impress upon the filer the duty of care that must be exercised in filing a proof of claim."

18

Persons signing the form do so under penalty of perjury and must attest that the information is true and correct to the best of their information, belief and knowledge. Wells Fargo's Proof of Claim fails these tests and the fact that Debtor has brought the omission of the modification agreements to both the Court's and Wells Fargo's attention, and the fact that despite such notice Wells Fargo has still not bothered to explain, amend or supplement the claim, speaks volumes to its fraudulent and knowing intentions.

### Neither the Court or Debtor Should Have to Engage in Hypothetical Musings Regarding the Terms of the Resolution Plan When Production of Same is Demanded as Part of the Proof of Claim.

This Court has engaged in some amount of supposition or frankly guesswork in arriving at certain opined shortcomings of Debtor's Plan in finding it to be proposed in *bad faith*. For instance, the Court has commented at paragraph 24:

> "'... the Debtor contends that payments of $1,721.00 per month will cover Wells Fargo's claim because he will show $1,721.00 is the correct payment amount in his adversary proceeding against Wells Fargo. Even so, the Debtor offers no clear explanation as to why he proposes no payments to Wells Fargo for escrow (*Wells Fargo paid the Debtor's real property taxes of more than $5,900.00 last year*) *or on the arrearage claim.*

Debtor respectfully contends that neither this Court nor Debtor should be called upon to explain, justify or hypothesize as to what might be the operable terms contained in an agreement which Wells Fargo has so far failed to even acknowledge,

let alone produce nor should the Court attempt to determine (without testimony from Wells Fargo) whether a purported expense of "$5900" was an escrow payment "or an arrearage claim" or whether in fact it ever actually paid such amount. The Resolution Plan spoken of by Wells Fargo is subject to an array of arsenals and tools for handling such issues such as escrows and arrears which are made available by HUD for FHA insured loans such as Debtor's.[5] The loan can be extended to 40 years. The interest rate may be reduced to within only .25 basis points above the treasury rate. Arrearages (including escrows) can be moved to the end of the loan and/or financed under a partial claim loan.[6]   The FHA/HUD restructuring opportunities can be combined in numerous ways with HAMP (Making Home Affordable Program) to further reduce payments and custom fit the needs of a homeowner. It is Wells Fargo's duty to produce the modification agreement—plain and simple. In short, without a document upon which to proceed, Wells Fargo's Claim cannot be considered for any purpose—let alone be used as a basis for dismissing Debtor's case *for bad faith*.

---

[5]   Some of the Loss Mitigation Options and techniques are available at:
< http://www.hud.gov/local/shared/working/faithbased/Panel_II-Hass.pdf >

[6]   A "partial claim" is an interest-free loan from HUD that does not have to be repaid until the first mortgage is paid off or until the borrower no longer owns the property. Such option can be used to: (1) reinstate a delinquent loan that is up to 12 months delinquent, and (2) buy down the first mortgage loan (up to 30% of the unpaid principal balance as of the date of default).

## **The Court's Findings are Profoundly Contrary to the Record**

Most disturbing for Debtor is the Court's statements at paragraph 28 of its Order which are profoundly contradicted by the plain face of the record and Plan. The Court stated:

> *The Debtor was advised by both the Trustee and the court, in no unequivocal terms, that his plan payments would need to be more than that proposed in his Third Plan* to deal with the filed claims in his case. The Debtor subsequently filed the Fourth Plan with reduced plan payments[7]. **Also, despite the Trustee's objections for the Debtor's failure to propose an adequate dividend to general unsecured creditors, the Debtor's most recent plan still proposes none.**

This is simply contrary to the plain record. As noted at the outset, Debtor had adopted *exactly* the payment amounts the Trustee had proposed as set out in his Motion to Dismiss and further adopted *exactly* the interest/dividends he had proposed. The very reason Debtor had done so was to avoid the possibility that the Court would find fault with anything that did not track the Trustee's requirements. Debtor could certainly find solace (he supposed) if he followed exactly the calculations and requirements of the Trustee—but apparently even this was not enough to dissuade the Court from dismissing the case.

---

[7]
    The Court took no cognizance of the fact that both Debtor and the Trustee had spread payments over 60 months where by contrast, Debtor's prior plan had spread payments over only about 36 months. Thus it is axiomatic and mathematically logical to expect that payments will be reduced when this is done. The Court did not chide the Trustee when it had proposed such lowered payments but has elected to blame Debtor **for following the lead of the Trustee.**

Similarly disturbing was the the suggestion by the Court that:

> "*Debtor was advised by both the Trustee and the court, <u>in no</u> <u>unequivocal terms</u>, that his plan payments would need to be more than that proposed in his Third Plan.*"

Debtor has searched the record and has found nothing that "*advised Debtor in no unequivocal terms, that his plan payments would need to be more than that proposed in his Third Plan.*" To the contrary, the Court's own Order of Dismissal belies this suggestion. The Court already stated at paragraph 20 of its dismissal order that:

> Despite grave concerns, the court afforded the Debtor an opportunity to show that he was making a good faith effort to propose and comply with his Chapter 13 plan by bringing his newly proposed plan payments of $4,309.67 current before the next hearing.

This the Debtor had done particularly considering the over-payments. Because the Court insisted on not addressing the over-payments and their effect on the Plan payments—*despite being asked to do so by the motion for clarification*—the Court bears at least some responsibility in avoiding this issue and creating or allowing the uncertainty and confusion to remain.

### Any Delay in Reaching a Confirmable Plan is Traceable to Wells Fargo's Incomplete Proof of Claim and the Court's Failure to Hold a Hearing on Debtor's Objection to the Claim and to Hold a Hearing on Wells Fargo's Motion for Relief From Stay.

This Court has unfairly laid blame for any delay in this case on Debtor's doorstep. As an initial matter, the only claim that has ever been subject to debate is the claim

of Wells Fargo. All other creditors' treatment has not garnered any mention in this Court's discussions. No other creditor has objected nor moved for relief from stay and there were no arrears due to such creditors at the time this case was filed. Instead, the only point of contention was the validity and amount of Wells Fargo's Proof of Claim. Debtor did his part by timely objecting to the Proof of Claim. This Court thereafter was required to hold a hearing on such objection but has as yet scheduled no hearing. Not only has the Court not scheduled a hearing on Debtors claim objection, but the only other hearing that might have otherwise raised and disposed of some of the same issues (specifically a hearing on Wells Fargo's Motion for Relief From Stay) has also not been scheduled by the Court as it has seen fit to continue/reschedule or *delay* such a hearing **at Wells Fargo's request**—*not Debtor's*. Consequently, Debtor respectfully contends that this Court bears the lion share of blame for any delay in this case followed by Wells Fargo's persistent requests for continuances and its false and/or incomplete Proof of Claim.

### The Record Reflects That Debtor's Income is Actually Far Higher Than Was Determined By the Court Resulting From Clerical Error.

In its Order at ¶ 13 of the Dismissal Order , the Court determined:

> As to his income, the Debtor's Schedules I and J and Form Amended 122-C are difficult to comprehend. On his Schedule I, the Debtor lists his gross monthly income as $4,333.00 and his spouse's gross income as $6,444.00. The Debtor also lists $8,997.00 in combined monthly net income, $6,912.00 in monthly expenses and $2,085.00 in monthly net

23

income on his Schedule I and J. On Form 122-C, the Debtor lists his gross wages as $4,359.00 per month and his spouse's gross wages as $2,465.00 per month, with combined monthly income of $11,276.00. The Debtor has clarified through testimony that he has monthly gross wages of $4,359.00 and his spouse has "a bit more" than $2,465.00, such that his gross household income, excluding rental income, is approximately $6,800.00. The Debtor also receives $845.00 per month in rental income from the townhome.

The information which the Court has missed simply resulted from an error in transposing number totals from one page to the other. On Form 122C-1 the actual total for combined income ($11,276) is correct[8] but the missing entry to show how that total is arrived at is Debtor's Spouse's retirement income from line 9. Debtor failed to enter such amount which is $3978 and which, when combined with her regular income of $2465 from line 1, gives her total as $6443, which was already correctly entered. Debtor has accordingly filed an amended Form 122C to include the omitted entry.    Similarly, on Schedule I, Debtor inadvertently failed to drop down his Spouse's income from line 1 ($6443) to the box total on line 10 and also line 12, such that the total combined income for Schedule I is actually $10,075. Debtor has Amended Schedule I accordingly as well.

Because of all the forgoing points and authorities leave no question that Debtor has not shown bad faith and that his proposed plan treatment of Wells Fargo, in light of the facts presented (though omitted by Wells Fargo) sufficiently supports his

---

8    Although Debtor also erred when multiplying $11,276 by 12, The yearly amount should be $135,312.

proposed treatment to avoid the suggestion of bad faith and because the Court bears some significant responsibility in the delay of this action and because the undisputed facts of record show that Wells Fargo has intentionally filed a false Proof of Claim, this Court should vacate the dismissal for cause, sanction Wells Fargo by disallowing its claim, and allow Debtor to proceed with his Plan with respect to all other creditors who have filed valid proofs of claim.

### ***MOTION FOR STAY OF PROCEEDINGS IF VACATION IS DENIED***

Should the Court deny Debtor's Motion to Reconsider and/or to Vacate, Debtor moves the Court to stay proceedings pending appeal and hold a hearing as to an amount (if any) necessary for a supersedeas bond.

### Legal Standard:

Fed. R. Bankr. P. 8005 provides that a party may move for "stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal." Fed. R. Bankr. P. 8005. A discretionary stay is appropriate if: (1) appellant is likely to succeed on the merits of the appeal; (2) appellant will suffer irreparable injury (absent a stay); (3) the stay will do no harm to the appellee; and (4) the stay will do no harm to the public interest. *In re Byrd,* 172 B.R. 970, 974 (Bankr. W.D. Wash. 1994). The moving party "need not satisfy all elements, but rather the Court is to balance the factors." *In re Seidel*, 443 B.R. 411, 413 (Bankr. S.D. Ohio 2011); see also *Coal. to Defend Affirmative Action v.*

*Granholm*, 473 F.3d 237, 244 (6 Cir. 2006) at 244 ("All four factors are not prerequisites but are interconnected considerations that must be balanced together.").

> In essence, a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal. Presumably, there is a reduced probability of error, at least with respect to a court's findings of fact, because the district court had the benefit of a complete record that can be reviewed by this court when considering the motion for a stay.
>
> To justify the granting of a stay, however, a movant need not always establish a high probability of success on the merits. The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay. Simply stated, more of one excuses less of the other. This relationship, however, is not without its limits; the movant is always required to demonstrate more than the mere "possibility" of success on the merits. For example, even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the defendant if a stay is granted, he is still required to show, at a minimum, "serious questions going to the merits."

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6 Cir. 1991));at 153-54 (internal citations omitted).

For purposes of this Motion, Debtor notes that since all other parties except Wells Fargo have no arrears associated with their debts and since Debtor's initial Plan had paid to such creditors the payments due under their respective contracts with Debtor (being paid directly by Debtor before the Trustees objections to such practice) these creditors are not likely to suffer any significant harm—inconvenience perhaps, but no significant harm. But as to Wells Fargo, Debtor specifically notes that Wells

Fargo will not suffer any harm due to any relatively short delay caused by the appeal. This is so because it is a matter of judicial notice that Wells Fargo's foreclosure action was dismissed back in 2012. Wells Fargo was so unaffected by the passing of time that it waited 4 years before refiling a foreclosure case against Debtor. If Wells could inexplicably wait for 4 years to bring its next proceeding, it cannot seriously argue to this Court that it will be harmed by the delay occasioned by an appeal. By contrast, Debtor is the only party that will be substantially affected and irreparably harmed if a stay is not imposed because as the loss of his home will have a severe effect and impact on him and his entire family. Thus, in balancing relative harms, this issue weighs in Debtor's favor by far. Debtor also contends that given the undisputed facts showing that Wells Fargo knowingly filed a false Proof of Claim, there is some question whether Wells Fargo could be harmed at all because given such conduct, its Proof of Claim is axiomatically invalid and insufficient such that it has no legitimate harm or loss to be suffered. If Wells Fargo's claim cannot be allowed due to its incompleteness, Wells should not even be in this Court let alone suffer some harm. Debtor would further contend that the maxim "he who would have equity must do equity" and the "clean hands doctrine" has some application when considering a request by Wells Fargo for a protective bond.

Finally, Debtor contends that there is a strong likelihood of success on the merits

because the findings of this court of "cause" for dismissal of this case revolved exclusively on the validity of Wells Fargo's claim representations relied upon by both by this Court as well as the Trustee. The facts however prove that Wells Fargo has betrayed this trust, has misled the Court, and has attempted to enforce a false claim against Debtor. The findings of this Court are also demonstrably erroneous on the face of the record in the particulars set out *supra*.

For all these reasons the Court should not require a bond or in the alternative, the bond should be modest in amount.

Respectfully submitted this 3rd day of December, 2018

BY: _Ralph M. Foster_

Ralph M. Foster

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing pleading was served by first class mail, postage prepaid, to the following parties at their respective addresses set forth below:

Richard M. Hutson, II , Chapter 13 Office
P. O. Box 3613
Durham, NC 27702

William P. Harris,
Shapiro & Ingle, LLP 10130, *Attorney for Wells Fargo*
Perimeter Pkwy, Suite 400
Charlotte, NC 28216

North Carolina
Department of Revenue
PO Box 25000, Raleigh NC 27640-0002

Department of the Treasury
Internal Revenue Service
PO Box 8208
Philadelphia, PA 19101-8208

Sun Trust Bank
PO Box 305183
Nashville TN 37230-6165

Nordstrom
Card Services
PO Box 6555, Englewood, CO 80155

Flagship Credit Acceptance
PO Box 975658
Dallas, TX 75397-5658

Recovery Management System Corporation
25 2nd Ave. S.E., Suite 1120
Miami, FL 33131-1605

State Employees Credit Union
PO Box 29606
Raleigh, NC 27626-0606

State Employees Credit Union
PO Box 25279
Raleigh, NC 27611-5279

CarMax Auto Finance
Attention: Customer Service
225 Chastain Meadows Ct,
Kennesaw, GA 30144

VSA Resorts
2696 Reliance Drive, Suite 300
Virginia Beach, VA 23452

Ally Bank
Payment Processing Center
Po Box 9001951
Louisville, KY 40290-1951

Wells Fargo Bank, N.A. Default Document Processing
Attn: Managing Agent / Officer
MAC#N9286-01Y 1000 Blue Gentian Road
Eagan, MN 55121-7700

Synchrony Bank % PRA Receivables Mgmt. LLC
Attn: Managing Agent / Officer
P O Box 41021
Norfolk, VA 23541

Office of the United States Attorney Civil Process Clerk
 South Edgeworth Street, 4th Flr.
Greensboro, NC 27401

This 3rd day of December, 2018

BY: _Ralph M. Foster_____

    Ralph M. Foster